INZER, Justice:
This is an appeal by Royce W. Beasley and his wife Lavonia Faye Beasley from a judgment of the Circuit Court of Jackson County dismissing their suit against ap-pellees United Gas Pipe Line Company and the City of Pascagoula as a result of a jury verdict for the appellees. We affirm.
Appellants instituted this suit against appellees seeking to recover damages for the wrongful death of their infant child, Steven Royce Beasley, who died as a result of burns received in a gas explosion in the house into which the appellants were in the process of moving. The declaration charged that the appellees were guilty of negligence in failing to odorize the gas which escaped into the house and exploded when a match was struck. It was charged that United Gas Pipe Line Company, hereinafter referred to as United, sold gas to the City of Pascagoula, hereinafter referred to as City, without malodorizing such gas, knowing that the city was going to supply the gas for domestic consumption. It was charged that the city supplied the gas without malodorant to the home into which appellants were moving, and as a proximate result thereof, the explosion occurred which resulted in the death of their child.
United answered and admitted that it supplied gas to the City of Pascagoula without it first being odorized, but denied that the city furnished the gas to its customers without properly odorizing the gas. It alleged it- had a contract with the city whereby it furnished the gas to the city for distribution to the city’s customers, and after the gas was delivered to the city, United had no control over the gas. It was also charged that the city agreed to odorize the gas and to assume full responsibility *909 for any injury or damage caused by the transmission of gas to its customers.
The city filed a separate answer and denied that it had been guilty of any negligence which resulted in or contributed to the explosion which caused the death of appellants’ child. It denied that it had failed to properly odorize the gas furnished to the home into which appellants were in the process of moving. The city affirmatively pled the sole proximate cause of the accident was the negligence of party or parties unknown who turned on the gas into the house when there was an open line. It was also charged that appellants violated city ordinances which caused or contributed to the accident.
A trial was had at the January 1970 term of the court, and it resulted in a jury verdict for the defendants. On motion of appellants for a new trial, the trial court sustained the motion for the reason that the court was of the opinion that the ve-nire was drawn in a manner which was a departure from the method required by statute. Another trial was had at the July 1970 term of the court and it resulted in a jury verdict for both defendants. Hence this appeal was taken.
Appellants urge three propositions for the reversal of this case. They are (1) the trial court was in error in overruling their motion for a new trial on the ground that the verdict of the jury is against the overwhelming weight of the evidence; (2) the instructions granted both defendants were erroneous; and (3) the admission of certain prejudicial evidence over the objection of appellants was erroneous.
The evidence in this case established that on the afternoon of June 9, 1968, at approximately 4:30 P.M., an explosion occurred at a residence located at 711 Twelfth Street, Pascagoula, Mississippi, resulting in the death of Steven Royce Beasley, son of appellants.
The residence was served by the gas system of the City of Pascagoula, and the gas had been purchased by the city from United.
The previous occupants of the house at this location, Mr. and Mrs. Edward Wells, had moved out of the premises, on Friday, June 7, 1968, and in the process of moving had sold several items of furniture and appliances to a used furniture dealer, Mr. Prentiss Fisher, who removed the items from the house. Included among the items purchased was a gas stove, and Fisher testified that before the stove was removed Mr. Wells took a wrench and went outside to turn off the gas at the meter, then came back inside and disconnected the stove from the gas pipeline in the kitchen, leaving the pipe uncapped. The uncapped gas pipe was the source of the gas which burned causing the explosion and fire.
On Saturday, June 8, 1968, Mr. and Mrs. Beasley looked at the house, decided to move in, and spent the evening cleaning up the house and starting to move into it. On the following morning they continued to move into the house and during the morning placed their electric stove against the open, uncapped gas pipe in the kitchen. Mr. Beasley testified he saw the uncapped gas pipe as the electric range was put in place but did not check it. About 2:30 P.M. on Sunday afternoon an air condition: er was installed in the living room window blowing toward the kitchen, and the air conditioner was turned on at its highest speed. Also, about the same time Mr. Alton Renfroe, father of Mrs. Beasley and one of the several relatives who came to assist in moving, lit the hot water heater in the kitchen in order to wash some diapers. The diapers were then washed and hung out on the line. About 4:00 P.M. the child was lying on a pallet under the window air conditioner in the living room when Mrs. Renfroe struck a match to light a cigarette, the explosion and the fire occurred. The child died about two days later.
The three adult persons who were in the house at the time of the explosion testified they did not smell gas at anytime prior to the explosion. Four others who were in and *910 out of the house earlier that day also testified they never smelled gas in the house, and Mr. Renfroe testified he did not turn on the gas at the meter prior to the lighting of the hot water heater. He did say the pilot light on the hot water heater was off when he checked it and had to light it. The fire chief testified the pilot light had no cut off valve, and if gas was coming into the house, the pilot light would be on unless the gas had been turned off at the meter and then turned on.
The city receives its natural gas from United at two metering and odorizing stations. The gas is received by the city in an unodorized state, but is odorized at both stations by units, which were at the time of the accident regulated to inject odorant into the natural gas flowing into the city’s distribution system at the rate of one gallon of odorant per million cubic feet of gas at both of said stations. Either of these units has sufficient capacity to serve the entire city, and the entire city is an integrated system which has many cross connections and tie-ins, making it one system with the pressure kept at the same level over the entire system. The odorizers operate on a demand basis, injecting odor-ant at the rate of one gallon per million cubic feet of gas according to the rate of the flow of gas. If either of the units should go out, the other unit would serve the city with sufficient odorant. The month of June 1968 was the lowest month in the year in terms of consumption of natural gas. The consumption for the entire month was only 79,788,000 cubic feet. Each of the two odorized stations had a capacity of 85 gallons of odorant for a total between the two of 170 gallons. The odor-izing machines are filled when they reach the half-way point on the gauge and, within two weeks of the accident, they were filled on May 28 and May 30, 1968, one on each of the aforesaid dates. The machines are checked as to amount of odorant and operations of the mechanism on every Monday and Friday, as well as other times when a crew happened to be in the vicinity. The superintendent made an inspection of the machines two days prior to the accident. The odorizing stations have never broken down and have never run out of odorant.
The ratio of odorant to gas used by the City of Pascagoula is ten times the minimum requirements of the State of Mississippi and four times the minimum suggested requirements of the odorant manufacturer.
The machines used to inject odorant into the lines are shown to be of standard manufacture and have never failed to work since the system was installed. If odorant should cease to be injected into the system, odor would continue to be present for a couple of days after the odorized gas in the system was used up, because the odorant saturates and accumulates inside the pipe.
When the firemen arrived after the explosion, the gas had been turned off at the meter. The next morning the gas was checked by several persons and the odor was in the gas at the house, as well as in the main on Twelfth Street.
On Wednesday, Thursday and Friday preceding the Sunday of the accident repairs and replacements were made by the employees of the city, and such repairs and replacements require that the lines be purged until gas can be smelled. Leaks are reported by various people and usually based on smell. One witness testified to smelling a gas leak on Sunday, the date of the accident and reporting it on Monday. There was no proof of any other explosions or fires attributed to gas occurring in the city during this period of time.
The evidence reflected that people become accustomed to the odor of the gas and no longer notice it after ten or fifteen minutes. The meter reading at the house on Monday morning following the accident showed that only 700 cubic feet of gas had been used since the previous reading twelve days earlier.
The resulting experiment conducted by Mr. Alton Nelson with the same type gas *911 meter, same length of pipe, under the same pressure, with the valve open demonstrated that 700 feet of gas would pass through the meter in one hour and fifteen minutes under those conditions.
Natural gas is lighter than air and therefore will rise, accumulating first in the upper parts of an enclosed area. The gas after having been metered at a residence flows into the residence at only four ounces of pressure per square inch. This is a low pressure, and gas flowing from an opening of a three-quarter inch pipe at this rate could he sealed off with very slight thumb pressure or just ounces of pressure.
It is apparent from the foregoing facts that it was a clear cut jury issue as to whether the gas causing the explosion was properly odorized by the city. After carefully considering the evidence in this case, we are of the opinion the trial court was correct in refusing to grant a new trial on the ground that the verdict of the jury was against the overwhelming weight of the evidence. There was ample evidence in this case to support the verdict of the jury, and its verdict is not against the overwhelming weight of the evidence.
We find no error in the instructions granted on behalf of the city. Each of the instructions complained of clearly stated that if the jury believed from a preponderance of the evidence that the gas was properly odorized, and if the jury believed from a preponderance of the evidence that certain other facts existed, then it should find for the city. . What the city actually did under these instructions was to assume a greater burden than it was required to assume under the facts and pleadings of this case. The city was entitled to a verdict if the jury believed from the evidence that the gas was properly odorized. That was the only charge of negligence on the part of the city that there was any proof to support. We are unable to see how appellants were prejudiced by the city assuming a greater burden than it was required to assume, and we are unable to see how the jury could have been misled by these instructions.
Appellants also complain about one instruction granted at the request of United. The error in this instruction, if any, was harmless error because the jury must have found that the gas was properly odorized by the city and, that being true, a verdict could not be returned against United. The instruction complained of in effect told the jury that if it believed from the evidence that United was negligent in failing to odorize the gas, and if it further believed from the evidence that the city assumed the responsibility of odorizing the gas and failed to do so, then the jury should return a verdict for United. We do not need to pause to ascertain whether United was entitled to the instruction because the jury found that the city had properly odorized the gas. Appellants were not prejudiced by this instruction. The error, if any, was harmless error. Miss.Sup.Ct. Rule 11 (1967).
Finally, appellants complain of the admission of the testimony of Don Rico as to finding odor present in the gas main on Twelfth Street on the morning following the accident. Two other witnesses testified without objection that odor was present in the gas coming into the house on the morning following the accident. We think the testimony complained of was merely cumulative over the testimony of numerous witnesses who testified without objection that odor was present in the system several days before the accident and several days after the accident. The error, if any, under these circumstances was harmless error.
After careful review of the record in this case, we find no reversible error, and for this reason, this case should be and is affirmed.
Affirmed.
RODGERS, P. J., and JONES, BRADY and ROBERTSON, JJ., concur.